UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SOVEIDA M. VAZQUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-30176-KAR |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION FOR AN ORDER
AFFIRMING THE COMMISSIONER'S DECISION
(Docket Nos. 19 & 27)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

Soveida M. Vazquez ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a final decision of the Acting Commissioner of Social Security

("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title

XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1381 *et seq.*  Plaintiff applied for SSI on

December 18, 2017 alleging a January 1, 2016 onset of disability due to post traumatic stress

disorder ("PTSD"), anxiety, panic disorder, bipolar disorder, being a victim of sexual abuse, and

"back problems" (Administrative Record "A.R." at 43, 216).  After a hearing, the Administrative

Law Judge ("ALJ") found that Plaintiff was not disabled since December 18, 2017 and denied

her application for SSI (A.R. at 37-59).  The Appeals Council denied review on September 17,

2020 (A.R. at 1-6) and, thus, Plaintiff is entitled to judicial review.  *See Smith v. Berryhill,* 139 S.

Ct. 1765, 1772 (2019).

Plaintiff seeks remand or reversal based on her claim that the ALJ committed an error of law by failing adequately to explain her treatment of the opinions of Plaintiff's treating care providers. Before the court are Plaintiff's motion for judgment on the pleadings (Dkt. No. 19), and the Commissioner's motion for an order affirming her decision (Dkt. No. 27). The parties have consented to this court's jurisdiction (Dkt. No. 18). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons set forth below, the court ALLOWS Plaintiff's motion and DENIES the Commissioner's motion.

II. LEGAL STANDARDS

A. The Legal Standard for Entitlement to SSI

In order to qualify for SSI, a claimant must demonstrate that she is disabled within the meaning of the Act. A claimant is disabled for purposes of SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. § 416.920(a)(4)(i)-(v). The hearing officer must determine whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe

impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's Residual Functional Capacity ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate his or her RFC.  *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations.  *See Goodermote*, 690 F.2d at 7.

    B.    <u>Standard of Review</u>

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court reviews questions of law *de novo*, *id.,* but "the ALJ's findings [of fact] shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion."  *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not."  *Purdy v. Berryhill,* 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

    III.    FACTUAL BACKGROUND

    A.    <u>Educational Background, Work History, and Daily Living Activities</u>

Plaintiff was 29 years old on the date of the hearing in September 2019 (A.R. at 75, 438). She completed school through the eighth or ninth grade and had worked as a waitress at a hotel restaurant for approximately four years and as a personal care attendant (A.R. at 80-81, 439). Plaintiff lived in an apartment with her significant other and their eight-year-old son (A.R. at 82). She cared for them and cooked and cleaned (A.R. at 234-35).  Plaintiff's function report indicated that she did not leave her apartment alone because she feared for her life when she left her home (A.R. at 236, 239).  She attended appointments, took her son to school, and shopped for groceries and for her son when necessary (A.R. at 236, 237).  She spent, at most, an hour at the store and wanted to go home as soon as she arrived (A.R. at 236).  According to Plaintiff, she suffered tension, anxiety, and panic attacks when she socialized, even with her family.  She had difficulty with relationships and tried to avoid meeting people (A.R. at 238).

Plaintiff indicated that she did not experience difficulty concentrating, usually understood written instructions, and sometimes needed redirection or repetition when she attempted to follow spoken instructions (A.R. at 328).  She was not able to handle stress and became anxious if her daily routine changed or if unexpected events occurred (A.R. at 239).

B.     Relevant Medical Treatment[1]

On May 25, 2017, Denise Cartagena of Baystate High Street Health Center ("Baystate") conducted a depression screen (PHQ-9) on Plaintiff that yielded a severity score of 21, which indicates severe depression (A.R. at 398).  Katie Costa, NP ("Costa"), noted that Plaintiff was experiencing flashbacks from being present in a house fire during the prior year and that she felt more isolated and agoraphobic (A.R. at 399).  Plaintiff's symptoms of depression and PTSD

---

[1] Because Plaintiff's motion is based on a challenge to the ALJ's treatment of her mental health care providers' opinions, the summary of medical evidence is limited accordingly.

included insomnia, smelling fire, seeing and feeling spirits around her, and tingling throughout her entire body (A.R. at 399).  Costa prescribed hydroxyzine and prazosin for Plaintiff's PTSD symptoms and anxiety until a psychiatric prescriber could treat her (A.R. at 401, 402).   At Plaintiff's June 6, 2017, visit to Baystate, she had a PHQ-9 score of 18, indicating moderately severe depression (A.R. at 391).  Plaintiff reported feeling much better since restarting the medications that Costa prescribed during the May 25th visit (A.R. at 392).

On June 28, 2017, Idalia Centeno, MSW ("Centeno"), of Sunrise Behavioral Health Center ("Sunrise") completed an Adult Comprehensive Assessment of Plaintiff (A.R. at 438, 448).  Plaintiff reported that she had been sexually assaulted by her stepfather when she was a child and, in the past, had been treated for PTSD, bipolar disorder, anxiety, panic attacks, stress, and back and chest pain, but had not taken psychotropic medication for two months (A.R. at 438, 441, 442, 561).  She suffered a relapse of her mental health conditions after her apartment burned in December 2016 and she lost everything (A.R. at 439).  The stress of trying to cope with her mental health issues as well as her significant other, who had bipolar disorder, and her son, who had ADHD and behavior problems in school, caused her to seek treatment at Sunrise to manage her panic attacks, depression, and anxiety (A.R. at 438, 441).  Plaintiff indicated that she needed structure to function well, was not able to tolerate changes in her routine, and could not go out alone (A.R. at 438, 447).

On the mental health exam, Plaintiff's appearance, eye contact, build, posture, behavior, speech, mood, affect, facial expressions, perception, thought content, thought process, intellectual functioning, orientation, memory, insight, and judgment were within normal limits (A.R. at 443-44).  She presented as agitated and constantly referred to her fears of being alone and in crowded places (A.R. at 443, 444).  Centeno identified anxiety, mood swings, depression,

and trauma as Plaintiff's current mental health management needs and diagnosed bipolar I disorder, current or most recent episode depressed with psychotic features, and PTSD (A.R. at 445-46, 448).  Centeno noted that Plaintiff's mood disturbance was sufficiently severe to cause marked impairment in social and occupational functioning (A.R. at 447).

During her August 21, 2017, treatment at Sunrise, Plaintiff rated the severity of her daily panic attacks as 6 to 7 on a scale of 1 to 10 (A.R. at 561).  She reported having a panic attack during the visit although there were no obvious signs (A.R. at 561).  In addition, Plaintiff reported sleeping two to three hours per night, having nightly auditory hallucinations, mood lability (7-8/10), and yelling a lot (A.R. at 561, 564).  Plaintiff's mental status exam showed a restless appearance, anxious mood, and blunted affect (A.R. at 563, 564, 565).  She reported experiencing auditory hallucinations nightly (A.R. at 561, 564).  Her speech was normal, her thought process/associations were coherent, logical, and appropriately goal directed, her attention, concentration, judgement/insight, fund of knowledge, short and long-term memory, and language were intact, and she was fully oriented (A.R. at 563-64).  Plaintiff was diagnosed with major depressive disorder with psychotic features and rule out bipolar II (A.R. at 565).  She was prescribed paroxetine for anxiety and mood; an increase in the dosage of quetiapine for psychosis and mood stabilization; and an increase in the dosage of hydroxyzine (A.R. at 565).  Prazosin was discontinued due to its side effects (A.R. at 565).

When Plaintiff returned to Sunrise on November 6, 2017, she reported that hydroxyzine helped to reduce her anxiety.  She averaged two to three hours of sleep each night but was unable to take quetiapine because she had to get up during the night for her son (A.R. at 451, 452).  She also reported auditory and visual hallucinations and mood lability (A.R. at 451, 454).  Her mental status exam remained the same.  Visual hallucinations were noted along with the auditory

ones, and her mood and affect were anxious (A.R. at 454, 455).  Rachel Thomas, CNS ("Thomas"), continued Plaintiff's paroxetine and hydroxyzine (A.R. at 455).  Quetiapine was discontinued due to sedation (A.R. at 455).  Thomas added risperidone for psychosis and mood stabilization and lamotrigine for mood lability/stabilization (A.R. at 455).

On December 6, 2017, at Baystate, Plaintiff participated in another PHQ-9 depression screening (A.R. at 381).  Her severity score was 18, which indicated moderately severe depression (A.R. at 381).

Plaintiff returned to Sunrise on February 21, 2018 for medication management (A.R. at 431).  She had been unmedicated for two months because she missed her follow-up appointments (A.R. at 431).  She indicated that it was hard to get to the appointments, but she was doing alright (A.R. at 431).  She continued to suffer from anxiety, insomnia, visual hallucinations, and mood lability (A.R. at 431).  The mental status exam checklist remained the same as on November 6, 2017, including a restless appearance, reported auditory and visual hallucinations, and anxious mood and affect (A.R. at 433-35).  Thomas did not alter Plaintiff's medications (A.R. at 435-36).

The record of Plaintiff's March 21, 2018, visit to Sunrise indicated that she was doing much better (A.R. at 465).  Her psychosis had improved, but her sleep disturbance and mood lability remained the same (A.R. at 465).  The mental status exam indicated that she still appeared restless, but she did not report hallucinations and her mood was euthymic (A.R. at 468, 469).  Plaintiff's dosages of paroxetine, risperidone, and lamotrigine were increased and propranolol for anxiety/headache and benztropine for side effects were added (A.R. at 470).  The dosage of hydroxyzine pamoate remained the same (A.R. at 469).

Plaintiff returned to Sunrise on April 23, 2018 (A.R. at 423). She reported lingering insomnia and depression, controlled anxiety, and improved psychosis (A.R. at 423). The mental status exam remained the same as in March 2018 (A.R. at 426-28). Thomas continued Plaintiff's dosages of paroxetine, risperidone, lamotrigine, hydroxyzine pamoate, and benztropine, started trazodone for sleep and mood, and increased the dosage of propranolol (A.R. at 428).

On May 5, 2018, Centeno's update indicated that Plaintiff continued to report anxiety, worries, sweating and fast palpitations symptoms when she left her home for meetings with her son's teachers (A.R. at 558). She also reported sleep disturbance, mild psychotic features, mood swings, and irritable behavior (A.R. at 558).

Plaintiff missed her May 23, 2018, medication appointment at Sunrise (A.R. at 472). The record of Plaintiff's June 21, 2018, Sunrise visit indicated that she could not be around people, her mood was labile, her anxiety was at a level of 10/10, and she was not sleeping (A.R. at 476). Plaintiff reported a reduction in the intensity of her psychosis (A.R. at 476). The mental status exam was unchanged from March and April (A.R. at 483-84). Thomas increased Plaintiff's dosages of paroxetine and lamotrigine, continued risperidone, hydroxyzine pamoate, benztropine, propranolol, started zolpidem (insomnia), and discontinued trazodone because it was ineffective (A.R. at 485).

At Plaintiff's July 12, 2018, visit to Costa, her primary care provider, Plaintiff reported that she could not walk alone in public places or work because of fear and anxiety (A.R. at 597). Plaintiff's mood and affect were within normal limits (A.R. at 598). She was calm, her speech and thought processes were clear, and she had no delusions (A.R. at 598).

On September 17, 2018, Plaintiff reported sleeping for six to eight hours a night (A.R. at 542). Her mood lability had improved, but her anxiety was at 9/10 (A.R. at 542). She also

indicated that she experienced auditory and visual hallucinations daily: she heard a baby crying and screaming and saw peripheral shadows (A.R. at 542).  The results of the mental status exam did not change (A.R. at 544-46).  Thomas increased Plaintiff's dosages of lamotrigine and risperidone, and continued the dosages of paroxetine, zolpidem, hydroxyzine, benztropine, and propranolol (A.R. at 546-47).

Plaintiff complained of depression during her October 16, 2018, visit to Sunrise (A.R. at 535).  She continued to report mood lability, anxiety, interrupted sleep, and psychosis (A.R. at 535).  The mental status exam checklist remained the same (A.R. at 538-39).  Thomas increased Plaintiff's dosage of paroxetine and continued the dosages of the other six medications (A.R. at 539-40).

Plaintiff visited Baystate on November 30, 2018, for treatment of PTSD (A.R. at 605).  Costa observed that Plaintiff was rocking and was still highly debilitated (A.R. at 606).  Although Plaintiff was calm, cooperative, pleasant and clear thinking, she presented with a depressed mood and affect (A.R. at 607).  Plaintiff's PHQ-9 depression screen yielded a score of 19, indicating moderately severe depression (A.R. at 608).

During her visit to Sunrise on December 11, 2018, Plaintiff reported depression and PTSD symptoms as well as mood lability, anxiety, interrupted sleep, and psychosis (A.R. at 528).  The mental status exam checklist did not change, except that the assessment of Plaintiff's mood and affect changed from euthymic to anxious (A.R. at 532).  PTSD was added to the diagnoses (A.R. at 532).  There were no changes to Plaintiff's prescriptions (A.R. at 533).

The note for Plaintiff's February 11, 2019, visit to Sunrise indicated that she did not take her medications consistently (A.R. at 521).  On April 8, 2019, Plaintiff reported too much stress, mood lability of 9, anxiety at 4, sleep for four hours per night, and psychosis (A.R. at 521).  The

mental status exam checklist did not change, nor did her medications and dosages (A.R. at 524-25, 526).  Anxiety, insomnia, and non-compliance were added to Plaintiff's previous diagnoses of major depressive disorder with psychotic features, rule out bi-polar II, and PTSD (A.R. at 525-26).

Costa's record of Plaintiff's April 22, 2019, visit to Baystate noted a long history of severe PTSD, anxiety, and agoraphobia that had not improved in years of treatment.  Plaintiff told Costa that fear and anxiety prevented her from walking alone in public and from going to the laundry room in her apartment building.  She washed her clothes by hand instead.  Plaintiff presented as very nervous, tremulous, panicky, and difficult to calm (A.R. at 614).  Costa noted that Plaintiff's medication was not working, and Plaintiff was highly symptomatic (A.R. at 614).  Costa wrote to Plaintiff's landlord asking for permission for Plaintiff to install a washing machine in her apartment (A.R. at 570).

During Plaintiff's May 20, 2019, visit to Baystate, she reported that she hallucinated during the day.  Costa noted that Plaintiff was receiving therapy in her home (A.R. at 628, 629).  Plaintiff felt her medications were working (A.R. at 628). Costa observed that Plaintiff was in good spirits, smiling, maintaining eye contact, and engaged in the visit and conversation (A.R. at 629).  Costa recommended that Plaintiff continue her current medication regimen (A.R. at 630).

On June 3, 2019, Plaintiff reported at Sunrise that she was stable (A.R. at 586).  There were no changes to her mental status exam (A.R. at 589-91).  Her mood and affect remained anxious (A.R. at 590-91).  Thomas continued Plaintiff's dosages of paroxetine, lamotrigine, risperidone, zolpidem, benztropine, and propranolol, started clonazepam for anxiety and sleep, and discontinued hydroxyzine pamoate (A.R. at 591).

C.      Consultative Examinations

11

1.      Douglas Williams, Psy.D.

Douglas Williams, Psy.D. ("Williams"), of UMASS Medical Center's Disability Evaluation Services, evaluated Plaintiff on December 7, 2016.  Plaintiff reported problems with bipolar disorder, anxiety, depression, and stress, and that she was typically in a bad mood.  She said that her sleep was very poor, that she suffered from a lack of interest, poor concentration, crying spells and daily panic attacks and that she saw spirits at night.  She denied suicidal ideation (A.R. at 579).  She denied alcohol or tobacco use, substance abuse, arrest, or incarceration (A.R. at 580).  She had received special education services while she attended school and left after the ninth grade (A.R. at 580).

In December 2016, Plaintiff, her significant other, and their son were living in a shelter because they had lost their home in a fire (A.R. at 580, 581).  Plaintiff brought her son to and from school, prepared meals, performed household chores, and visited with family members, but expressed social anxiety and a fear of leaving her home (A.R. at 580, 581).

On the Mini Mental Status Examination ("MMSE"), Williams noted that Plaintiff presented signs of depression and anxiety.  She scored 22/30.  Plaintiff's responses reflected mild difficulties with every day cognitive skills and basic problem-solving abilities (A.R. at 581).  Williams diagnosed major depressive disorder, recurrent, moderate, rule out PTSD, social anxiety disorder, neurodevelopmental disorder, unspecified, and history of a "'mini stroke'" in 2013 (A.R. at 581).

Williams evaluated Plaintiff again on November 22, 2017 (A.R. at 574).  Plaintiff, her significant other, and their son had moved into an apartment (A.R. at 575).  In addition to the bipolar disorder, anxiety, depression, and stress noted in Williams' earlier evaluation, Plaintiff reported problems with daily panic attacks and hallucinations.  Plaintiff further described

symptoms of depression, including an occasional lack of interest, fatigue, poor concentration, and crying spells, as well as PTSD symptoms, including flashbacks, nightmares, hypervigilance, social anxiety, and difficulty trusting others (A.R. at 574).  She argued with family members and had no friends (A.R. at 574, 576).  Plaintiff indicated that she was unable to work because she was not able to leave her home by herself (A.R. at 575).  She said that her significant other had to accompany her to her last job as a personal care attendant (A.R. at 575, 576).

At this second evaluation, Williams conducted another MMSE.  He noted that Plaintiff presented a flat and depressed affect and that her speech seemed somewhat rapid.  Plaintiff scored 28/30.  Her everyday cognitive abilities were within normal expectations.  She displayed simple problem-solving skills but was likely to have relative difficulty handling complex and abstract information (A.R. at 576).  Williams diagnosed Plaintiff with unspecified neurodevelopmental disorder, PTSD, generalized anxiety disorder, depressive disorder, unspecified, moderate, chronic back and leg pain, and migraine headaches (A.R. at 577).  He noted that the results from the interview seemed valid and reliable (A.R. at 577).

2.    Richard Stillson, Ph.D.

Richard Stillson, Ph.D. ("Stillson"), of Hartford Psychological Services, examined Plaintiff on December 7, 2018 (A.R. at 507).  Stillson was directed to perform a psychodiagnostics interview with a full mental status examination and a detailed assessment of Plaintiff's activities of daily living and medication use, provide DSM 5 diagnoses, and address the credibility of Plaintiff's self-report (A.R. at 507).

Plaintiff reported to Stillson that she was unable to work because of the symptoms of PTSD, anxiety, and back problems (A.R. at 507).  There are factual discrepancies between Stillson's description of Plaintiff, her living situation, and her medical and psychiatric history,

and the information in other records that are so significant as to raise a doubt that his report has any validity.  By way of example, Stillson described Plaintiff as overweight, having three children, the youngest of whom was in jail, and one of whom had rejected her, having been stabbed in her forehead by her boyfriend, having twice attempted suicide by overdose, and being incarcerated because her children were doing drugs in her house (A.R. 508, 509, 511).  This colorful history is very much at odds with the information in all of Plaintiff's other records, which report a single young child, no history of substance abuse, attempts at suicide, or incarceration, and a relatively stable domestic history (A.R. at 82, 438-39, 447).[2]

Stillson purportedly observed that Plaintiff was highly anxious, slightly distraught and disoriented.  She rocked in her chair, shook her leg, and trembled visibly.  She picked her fingernails throughout the session (A.R. at 509).  On the mental status exam, Stillson observed Plaintiff's tense posture, constantly shaking legs, trembling hands, and disheveled look (A.R. at 510).  She made good eye contact, was cooperative, spoke expressively and clearly, and exhibited good insight and judgment (A.R. at 510).  Stillson also noted Plaintiff's "variable" level of consciousness, disorientation in all spheres, "extremely anxious and depressed" mood, and flat affect (A.R. at 510).  Although her responses were coherent, they were marked with circumstantiality and tangentiality (A.R. at 510).  Plaintiff's attention span and memory were poor (A.R. at 510-11).  Stillson reported that Plaintiff's intellectual functioning "appear[ed] somewhere in the borderline range of intelligence" (A.R. at 511).

---

[2] There are other, equally striking discrepancies in Stillson's report, many of which are noted without apparent reservation or hesitation in the ALJ's decision (A.R. 49).  Again, merely by way of example, there is nothing in any record other than Stillson's report to suggest that Plaintiff was being assigned a visiting nurse to assist with housework (A.R. 510).  Stillson's report of the medications prescribed for Plaintiff and her history of mental health care treatment is also irreconcilable with the remainder of the record (A.R. 508).

Stillson reported administering the MMSE to Plaintiff to assess mental status and screen for cognitive impairment.  Plaintiff's score of 27/30 indicated no cognitive impairment in the areas of orientation, registration, attention and calculation, recall, and language (A.R. at 511). According to Stillson, Plaintiff felt she could function outside a highly structured living and/or day treatment setting for 2 or more years, and it appeared she was minimally effective at this (A.R. at 511-12).  (This question was not raised by, or addressed in, any of Plaintiff's other records, nor was it the reason for the referral to Stillson.)   Stillson noted that Plaintiff's emotional state made it hard to engage in full time work-like tasks and instructions according to her (A.R. at 512).  He further stated that she appeared to have difficulty getting along with others due to anxiety, could not take a bus independently, and needed assistance managing her benefits (A.R. at 512).  Stillson deemed Plaintiff's self-report to be credible and diagnosed chronic PTSD, major depressive disorder, recurrent episode, with psychotic features, and generalized anxiety disorder (A.R. at 512).  He reported a prognosis for Plaintiff that was fair if she was able to maintain a trusting involvement with a therapeutic alliance (A.R. at 512).

D.    Opinions

1.    State Agency Non-Examining Consultants

On June 12, 2018, state agency consultant Leslie E. Montgomery, Ph.D., A.B.P.P. ("Montgomery"), reviewed Plaintiff's records and noted that Plaintiff had long-standing depression, anxiety, and PTSD, but was currently improved and her mental status exams were normal (A.R. at 109).  Montgomery noted Plaintiff's reports of mood swings with some irritability and social avoidance (A.R. at 109).  On the mental residual functional capacity ("MRFC") assessment, Montgomery determined that Plaintiff was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended

periods, work in coordination with or in proximity to others, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods (A.R. at 113). Montgomery opined that Plaintiff would be able to perform only very familiar or extremely routine procedures due to her anxiety and PTSD (A.R. at 113).  Montgomery further opined that Plaintiff had moderate social interaction limitations in her ability to: interact appropriately with the general public due to her mood swings and irritability, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (A.R. at 113, 114).  Montgomery found that Plaintiff did not have understanding, memory, or adaptation limitations (A.R. at 113-14).

On December 1, 2018, on reconsideration, Carol A. McKenna, Ph.D. ("McKenna") agreed with Montgomery's MRFC assessment of Plaintiff's ability to sustain concentration and persistence (A.R. at 129).  McKenna noted that with adequate effort, Plaintiff would be able to sustain attention and concentration and persist at tasks, within the parameters of her physical limitations, for two-hour increments across an eight-hour day for five days per week (A.R. at 129).  McKenna believed, however, that Plaintiff's motivation was low (A.R. at 129).  McKenna agreed with Montgomery as to Plaintiff's moderate social interaction limitations, noting that Plaintiff was capable of adequate social interactions with appropriate effort, but would be most at ease in a setting with limited co-worker and public contact (A.R. at 130).  As to Plaintiff's limitations on her ability to adapt, McKenna opined that although Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, after a brief period of adjustment, she would be able to adapt to routine change, but she might resist changes (A.R.

at 130).  In summary, Dr. McKenna indicated that Plaintiff was cognitively intact and was

independent for self-care and activities of daily living, but not motivated (A.R. at 130).

        2.      Opinions from Plaintiff's Treating Health Care Providers

        a.      <u>Costa's Opinions</u>

On August 14, 2018, and April 22, 2019, Costa, Plaintiff's primary care provider, who

had been treating Plaintiff since 2015, noted Plaintiff's history of anxiety with agoraphobia,

depression, sexual assault, and PTSD (A.R. at 500, 517).  According to Costa, Plaintiff was

unable to cope with daily stress related to interacting with other people (A.R. at 500, 517).

Although Plaintiff could independently manage her activities of daily living and basic household

maintenance, she spent prolonged periods of time in her house leaving only for appointments

(A.R. at 500, 517).  Plaintiff's agoraphobia and decompensation when in the presence of men

made it difficult for her to maintain employment (A.R. at 500, 517).  Ms. Costa described

Plaintiff as very debilitated by her symptoms in August 2018 (A.R. at 500).  In April 2019, Costa

repeated her earlier opinion, listed Plaintiff's medications, and indicated that Plaintiff had not

experienced much clinical improvement (A.R. at 517-18).

        b.      <u>The Sunrise Treatment Providers' Opinions</u>

The Sunrise treatment providers agreed with Costa's assessment concerning Plaintiff's

limited ability to maintain regular attendance at work and appropriately interact with co-workers

and supervisors.  In addition, the Sunrise treatment providers opined that Plaintiff lacked the

capacity to adapt to changes in the work setting.

On October 3, 2018, Centeno, the therapist who had been treating Plaintiff at Sunrise for

more than a year, and Plaintiff's medication prescriber, Thomas, completed a Psychiatric

Disorder form (A.R. at 503-05).  They listed Plaintiff's diagnoses as Bipolar I, major depressive

disorder with psychotic features, and anxiety and described Plaintiff's symptoms as consisting of daily panic attacks, insomnia, auditory hallucinations, and high mood lability (A.R. at 503, 504). Centeno and Thomas indicated that medication and coping skills reduced the intensity of Plaintiff's depression, anxiety, and panic attacks (A.R. at 504).  In response to the question concerning whether Plaintiff was unable to function outside of a highly structured living and/or day treatment setting for two or more years, Centeno and Thomas replied that Plaintiff had never been institutionalized, but she had problems leaving her home, only went out in specific situations, and that even these limited excursions generated stress (A.R. at 503).

The Sunrise treatment providers stated that, at home, Plaintiff adhered to a daily routine because she had serious problems managing changes to her schedule.  Visits from her sister and loud noises caused distress and loss of focus (A.R. at 503, 504).  Centeno and Thomas agreed that Plaintiff's symptoms, including fear and anxiety, interfered with her ability to get along with other people, including relatives and neighbors (A.R. at 504).

Thomas, who had been treating Plaintiff on a monthly basis since August 2017, completed an MRFC assessment of Plaintiff on April 8, 2019 (A.R. at 513, 516).  Plaintiff's diagnoses were PTSD, major depressive disorder, and insomnia (A.R. at 513).  Thomas reported that Plaintiff was compliant with treatment and was not malingering (A.R. at 514).

The assessment asked Thomas to rate Plaintiff's ability to perform activities in four categories for forty hours per week (A.R. at 514-16).  The ratings scale ranged from none to extreme (A.R. at 514).[3]  As relevant to the limitations in Plaintiff's RFC that are at issue here,

---

[3] A marked functional limitation was defined as "the ability to function in this area is seriously limited."  An extreme rating meant that "the ability to function in this area is precluded" (A.R. at 514).

Thomas opined that Plaintiff was:  (1) markedly limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and (2) precluded from maintaining regular attendance, and being punctual within customary tolerances, working in coordination with or in proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number of and length of rest periods, responding appropriately to changes in the work setting, traveling in unfamiliar places or using public transportation, and tolerating normal levels of stress (A.R. at 514-16).  Plaintiff could maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take appropriate precautions (A.R. at 515-16).  Thomas had no evidence to rate Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors (A.R. at 515).  Thomas further opined that Plaintiff's impairment would substantially interfere with her ability to work on a regular and sustained basis at least 20% of the time and that she would miss at least 20 days per month due to her mental impairment or treatment.  In summary, Thomas stated that, in light of Plaintiff's mental impairment, she would not be able to work because she was unable to tolerate stress, communicate effectively with others, and maintain focus and attention (A.R. at 516).

     E.    <u>Hearing Evidence</u>

After describing her past work as a waitress at a restaurant and as a personal care attendant, Plaintiff testified that she could not work because she experienced panic attacks and anxiety, was unable to go anywhere alone, and was not comfortable being around people, particularly men, except for her significant other (A.R. at 80-82).  Plaintiff did not have a driver's license because she was afraid to drive (A.R. at 83).  She got her eight-year-old son ready for

school each day and rode with him and his father in the car to school (A.R. at 83, 85).  Her son's teachers were aware of her condition and limited the number of people in the room when she attended parent-teacher conferences (A.R. at 86).

Plaintiff went grocery shopping with her significant other but was in and out of stores (A.R. at 84).  She cooked and cleaned and washed the family's clothes by hand because she could not leave the apartment to do the laundry (A.R. at 84, 85, 96).  She watched television for about an hour each day and spent time on her phone and on Facebook (A.R. at 86-87).

She saw her therapist every three weeks and visited her psychiatrist every month (A.R. at 92).  Although the prescribed medications improved her symptoms, they did not relieve them completely (A.R. at 92).  She had difficulty sleeping but did not take a sleep aid because her son woke up in the middle of the night (A.R. at 92-93).  Plaintiff felt paranoid when she was near people, including her mother, and experienced panic attacks (A.R. at 93, 94-95).  She became angry if her daily routine was interrupted (A.R. at 96).

The ALJ asked the vocational expert ("VE") to assume a person of Plaintiff's age, education, and work experience who could work at all exertional levels and tolerate occasional exposure to dust, fumes, odors, gases, poor ventilation, extreme cold, and heat and humidity, but could not be exposed to hazards such as dangerous moving machinery and unprotected heights (A.R. at 100).  The ALJ asked the VE to assume the person could understand, remember, and carry out simple instructions without strict rate, pace, or production requirements, learn by simple demonstration, throughout an ordinary workday and workweek with normal breaks on a sustained basis, could not interact with the general public, could respond appropriately to occasional and superficial interaction with co-workers for simple work-related matters, could respond appropriately to supervisory directions and feedback for those simple work-related

matters, and could adapt to simple and occasional change and make simple and occasional

decisions in a routine work setting (A.R. at 100-01).  The VE opined that such a person could not

perform Plaintiff's past work, but could perform the light, unskilled jobs of laundry worker, hand

packer, and assembler (A.R. at 101).  The VE indicated there would be no jobs for an individual

who was absent from work at least twice per month, or who was a half hour late to work two or

three days per week, or who was off-task an additional hour per day (A.R. at 103).

  F.  <u>The ALJ's Decision</u>

  The ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. §

416.920(a)(4)(i)-(v); *see also Goodermote,* 690 F.2d at 6-7.  At the first step, the ALJ found that

Plaintiff had not engaged in substantial gainful activity since the application date of December

18, 2017 (A.R. at 39).  *See* 20 C.F.R. § 416.971 *et seq.*  At step two, the ALJ found that Plaintiff

had the following severe impairments:  PTSD, anxiety disorder, and major depressive

disorder/bipolar disorder (A.R. at 39).  *See* 20 C.F.R. § 416.920(c).  The ALJ concluded that

Plaintiff's acute back muscle spasms and migraine headaches were non-severe impairments (A.R.

at 40-41).  For purposes of step three, the ALJ reviewed Plaintiff's impairments and determined

that, either alone or in combination, her impairments did not meet or medically equal the severity

of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (A.R. at 41).  *See* 20

C.F.R. §§ 416.920(d), 416.925, 416.926.  After assessing the so-called paragraph B criteria, (1)

understanding, remembering, or applying information, (2) interacting with others, (3)

concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself, the ALJ

determined that Plaintiff had moderate limitations in each of those functional areas (A.R. at 41-

42).

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC.  The ALJ found that Plaintiff could perform a full range of work on all exertional levels with the following non-exertional limitations:

> she can tolerate occasional exposure to dust, fumes, odors, gases, poor ventilation, extreme cold, extreme heat and humidity.  She cannot tolerate exposure to hazards, such as dangerous moving machinery and unprotected heights.  She can understand, remember and carry out simple instructions without strict rate, pace or production requirements learned by simple demonstration throughout an ordinary workday and workweek with normal breaks on a sustained basis.  She cannot interact with the general public.  She can respond appropriately to occasional and superficial interaction with coworkers for simple work related matters.  She can respond appropriately to supervisory directions and supervisory feedback for simple work related matters.  She can adapt to simple and occasional change, and make simple and occasional decision[s] in the routine work setting.

(A.R. at 42-43).  At step four, the ALJ found that Plaintiff was not able to perform her past relevant work (A.R. at 58).  *See* 20 C.F.R. § 416.965.  However, taking into account Plaintiff's age, education, work experience, and RFC, based on the VE's testimony, the ALJ found that Plaintiff could perform the jobs of laundry worker, hand packer, and assembler (A.R. at 58-59).  *See* 20 C.F.R. §§ 416.969, 416.969(a).  Consequently, the ALJ concluded that Plaintiff had not been under a disability since December 18, 2017, the date on which she filed her application (A.R. at 59).  *See* 20 C.F.R. § 416.920(g).

V.   ANALYSIS

Plaintiff claims that the ALJ did not adequately explain the reasons she did not adopt Plaintiff's treating care providers' opinions about her functional limitations (Dkt. No. 20 at 9).  For her part, the Commissioner contends that the ALJ's assessment of the treatment providers' opinions was supported by substantial evidence (Dkt. No. 28 at 11-16).

The ALJ is responsible for determining the RFC.  *See* 20 C.F.R. § 416.946(c).

In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing

> basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

*Id.* (footnote omitted).  A court does not set aside an RFC determination supported by substantial evidence.  *See Jones v. Comm'r of Soc. Sec.,* Civil Action No. 20-11735-NMG, 2022 WL 43691, at *4 (D. Mass. Jan. 5, 2022).  The RFC assessment, however, must take into account all of the medical opinions in the case record.  *See Bellido-Benejan v. Comm'r of Soc. Sec.,* Crim. No. 19-1994 (SCC), 2021 WL 4352791, at *5 (D.P.R. Sept. 24, 2021).  For claims, such as Plaintiff's, that were filed after March 27, 2017, a "medical opinion" is defined as:

> a statement from a medical source about what [a claimant] can still do despite [her] impairment(s) and whether [she has] one or more impairment-related limitations or restrictions in the abilities . . . to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting.

20 C.F.R. § 416.913(a)(2)(i)(B).  Under recent revisions to SSA regulations, "[t]he [SSA] no longer 'defer[s] or give[s] any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [an applicant's] medical sources.'"  *Purdy*, 887 F.3d at 13 n.8 (second, third, and fourth alterations in original) (quoting 20 C.F.R. § 416.920c(a)).  "Instead, medical opinions and findings are evaluated for their persuasiveness according to a uniform set of considerations."  *Id.* (citing 20 C.F.R. § 416.920c(c)).  The factors used for evaluating the persuasiveness of medical opinions include (1) supportability, (2) consistency, (3) relationship with the claimant (including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and existence of an examination), (4) specialization, and (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding."  20 C.F.R. § 416.920c(c)(1)-(5).

23

The supportability factor is directed to how well a medical source's opinion is supported by objective medical evidence and supporting explanations.  20 C.F.R. § 416.920c(c)(1).  "Objective medical evidence is medical signs, laboratory findings, or both . . . ."  20 C.F.R. § 416.913(a)(1).  The consistency factor calls for a comparison between the medical opinions and "the evidence from other medical sources and nonmedical sources" in the record.  20 C.F.R. § 416.920c(c)(2).  The new regulations direct an ALJ to explain how he or she considered the supportability and consistency factors when evaluating medical opinions and making the disability determination.  *See* 20 C.F.R. § 416.920c(b)(2).  This requirement "allow[s] a subsequent reviewer or a reviewing court to trace the path of an [ALJ's] reasoning, and will not impede a reviewer's ability to review a determination or decision, or a court's ability to review [the Commissioner's] final decision."  Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules), 82 Fed. Reg. 5844, 5858 (Jan.. 18, 2017).

The ALJ stated that she fully considered the opinions of Williams, Stillson, the state agency consultants, Costa, and the Sunrise providers (A.R. at 48-57).  The ALJ eschewed any reliance on Williams' reports on the grounds that an ALJ is no longer required to explain why the ALJ is not adopting a disability finding made by another agency (A.R. 53-54).[4]  The ALJ found Stillson's assessment of Plaintiff's cognitive functioning and basic ability to function persuasive (A.R. at 50).  She found the state agency consultants' opinions to be only partially persuasive, primarily because they had not interviewed Plaintiff or reviewed the records,

---

[4] Because Williams evaluated Plaintiff to determine her eligibility for state benefits (A.R. at 574, 579), the regulations provide that his assessments are "neither valuable nor persuasive" on the ultimate question of disability.  20 C.F.R. § 416.920b(c)(2).  The ALJ could consider Williams' opinions but was not required to explain her assessment of them.  *See id.*

available at the hearing level, that showed no evidence of frequent or regular visits to an emergency room or hospitalizations due to disabling psychiatric symptoms (A.R. at 57).

Costa and the Sunrise providers, who had well-established treating relationships with Plaintiff, opined that Plaintiff's agoraphobia and extreme stress in interacting with others (particularly men) were limitations that would cause her to be unable to function effectively in a workplace or to show up for work on a full-time or regular basis. The ALJ gave no or limited weight to Costa's and the Sunrise providers' opinions on the grounds that the treating care providers' records did not support and were not consistent with their opinions because Plaintiff's mental status examinations were, in many categories, usually within in normal limits, and because Plaintiff had not been hospitalized for mental health impairments (A.R. 54, 56). The ALJ interpreted Stillson's opinion that Plaintiff could function outside of a highly structured living environment as consistent with and supporting the limitations that she included in the RFC, and she found that Stillson's opinions were credible because they were consistent with Costa's records insomuch as those records supported a finding that Plaintiff could manage her activities of daily living and household maintenance independently (A.R. 50).[5]

---

[5] In relying on Stillson's finding that Plaintiff could function outside of a highly structured environment for a year or more to develop the RFC, the ALJ relied on a finding that Plaintiff's mental health impairments did not satisfy the so-called Paragraph C criteria. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(C) (an individual who has a current history of one or more years of inability to function outside of a highly structured living environment may qualify as disabled). An individual can be disabled by a mental health impairment without meeting the Paragraph C criteria. Indeed, "[t]he Paragraph C criteria are assessed only if the Paragraph B criteria are not satisfied. If the claimant satisfies the A and B, or A and C criteria, [s]he will be considered disabled." *Horton v. Berryhill*, Case No. 4:17-CV-2897 JAR, 2019 WL 1317458, at *2 (E.D. Mo. Mar. 22, 2019) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A); 20 C.F.R. § 404.1520a)).

The First Circuit has said that the most important factors that the SSA must consider in determining the weight to assign to the opinions on which the ALJ relies in crafting the RFC are supportability and consistency.  *See Purdy*, 887 F.3d at 13 n.8 (citing 20 C.F.R. § 416.920c(b)(2)).  In applying these factors, an ALJ may not cherry-pick from the record.  *See Ares v. Berryhill*, Civil Action No. 16-cv-11439-IT, 2017 WL 5484674, at *5 (D. Mass. Nov. 15, 2017) (citing *Nguyen*, 172 F.3d at 35); *see also Bunner v. Berryhill*, Case No. 6:16-cv-2370, 2018 WL 1558449, at *5 (D. Or. Mar. 30, 2018) (although the ALJ is charged with resolving ambiguities in the record and conflicting testimony, "the ALJ must use the entire record and cannot cherry-pick sentences or phrases while ignoring the greater context.") (citing *Garrison v. Colvin*, 759 F.3d 995, 1017 n.23 (9th Cir. 2014)).  According to the SSA, it is an error of law to treat as persuasive an opinion that is not consistent with evidence from other sources.  *See* Revisions to Rules, 82 Fed. Reg. at 5844.  So far as appears from the ALJ's decision, Stillson's report of his psychological consultative examination was the primary source on which she relied for developing those aspects of the RFC that purport to address the functional limitations caused by Plaintiff's mental health impairments.  When an opinion is as riddled with fundamental inconsistencies with the remainder of the record as is Stillson's report, that report cannot properly be treated as persuasive by an ALJ and, in turn, serve as the primary basis for the provisions in the RFC aimed at addressing the functional limitations attributable to a claimant's significant impairments.  *Cf.* 20 C.F.R. § 416.920c(c)(1)-(5) (the factors for evaluating medical opinions are identified for purposes of determining the persuasiveness of the medical opinions in the record).  Because the ALJ identified Stillson's report as the primary source for important components of the RFC, the error is not minor and requires remand.

The ALJ's erroneous reliance on the Stillson report was compounded by her failure under the revised regulations adequately to justify her rejection of Costa's opinion and her limited acceptance of the opinions of the Sunrise providers.  "[T]he Regulations define supportability as the degree to which the opinion is supported by explanations from the medical source offering the opinion and objective medical evidence."  *Spaar v. Kijakazi*, CIVIL ACTION NO.: 5:20-cv-94, 2021 WL 6498838, at *5 (S.D. Ga. Dec. 28, 2021), *recommendation adopted,* CIVIL ACTION NO.: 5:20-cv-94, 2022 WL 141613 (S.D. Ga. Jan. 14, 2022) (citing 20 C.F.R. § 416.920c(c)(1)).  Costa pointed to Plaintiff's symptoms of anxiety with agoraphobia and depression to support her opinion that Plaintiff's main issues in the workplace would be maintaining regular attendance and appropriately responding to others (A.R. at 500, 517).  Costa had previously demonstrated her concern with Plaintiff's agoraphobia by seeking permission for her to install a washing machine in her apartment because she could not leave her apartment to use the common laundry room (A.R. at 614).  The ALJ's brief reference to the medical status examination results did little to clarify why she purported to find Costa's opinions unsupported by medical records in which, over several years, Costa had noted Plaintiff's severe PTSD, agoraphobia, isolation, depression, high degree of debilitation, and lack of improvement (A.R. 398-99, 605, 614).  *See Lewis v. Comm'r of Soc. Sec.,* Case No.: 8:20-cv-2262-DNF, 2022 WL 131198, at *5 (M.D. Fla. Jan. 14, 2022) (ALJ's "general and conclusory statement" that a treatment provider's opinion was not supported by his treatment records was insufficient; the ALJ should have discussed specific records and how they did not support the treatment provider's opinion); *LaMountain v. Saul,* C/A No. 0:20-3312-JMC-PJG, 2021 WL 5311239, at *4 (D.S.C. Sept. 9, 2021), *recommendation adopted sub nom. LaMountain v. Kijakazi,* Civil Action No. 0:20-cv-03312-JMC, 2021 WL 4932475 (D.S.C. Oct. 22, 2021) (ALJ's "general

conclusory statement" concerning supportability without specifying records that did not support the opinion did not comply with the regulations).

The ALJ concluded that although the Sunrise providers "assessed that [Plaintiff] would have difficulty when it came to relating to others including relatives, neighbors, and other people, . . . quickly became irritable, uncomfortable, and anxious at times, . . . avoided social contact [and] public transportation, and . . . found it difficult to manage transitions, this is not supported by their treatment notes" (A.R. at 55-56).  The ALJ noted generally that the medical evidence of record did not show visits to the emergency room or psychiatric hospitalizations while there were normal mental status examinations on several occasions at Sunrise (A.R. at 56). While the ALJ's decision addressed supportability, here too she did not identify specific treatment notes to explain her finding that the October 3, 2018, opinion, which included examples to support the Sunrise providers' conclusions, was not supported (A.R. at 55-56).  Nor did the ALJ discuss the import of the Sunrise treatment records showing that Plaintiff received psychotherapy in her home because she feared leaving her apartment, or that she consistently reported symptoms of anxiety, insomnia, and mood lability in addition to occasional psychosis and was prescribed multiple psychotropic medications to treat those conditions (A.R. at 54, 423, 428, 431, 435-36, 451, 455, 465, 469-70, 476, 485, 501, 521, 526, 528, 532-33, 535, 539-40, 542, 546-47, 558, 565, 586, 591).[6]  *Compare Patricia L. v. Kijakazi*, No. 2:20-CV-6736, 2021

---

[6] The Commissioner argues that the ALJ was not required to rely on Plaintiff's self-reported symptoms in the treatment notes when assessing the treatment providers' opinions (Dkt. No. 28 at 13-15).  However, "'[a] patient's report of complaints, or history, is an essential diagnostic tool.'"  *Abramson v. Comm'r of Soc. Sec. Admin.,* No. CV-19-00362-TUC-RM (DTF), 2020 WL 7022260, at * 6 (D. Ariz. Nov. 30, 2020) (quoting *Green-Younger v. Barnhart,* 335 F.3d 99, 107 (2d Cir. 2003)).  "A physician's reliance on a patient's statement of symptoms 'hardly undermines [the physician's] opinion as to [the patient's] functional limitations'" especially "'for diseases . . . that elude objective measurements.'"  *Id.* (quoting *Green-Younger,* 335 F.3d at 107).

WL 5356113, at *9 (D.N.J. Nov. 17, 2021) ("the ALJ specifically considered the supportability and consistency factors and explained why [specific portions of the treatment provider's] treatment notes and other evidence in the record rendered his opinions regarding Plaintiff's limitations as unpersuasive.").

Moreover, the ALJ did not sufficiently explain why the consistency between Costa's treatment notes and her opinions with those the Sunrise providers and the consistency of these materials with the remainder of the record were not persuasive as to the extent of Plaintiff's functional limitations attributable to her mental health impairments.  *See Flattery v. Comm'r of Soc. Sec. Admin.*, C/A No. 9:20-cv-02600-RBH-MHC, 2021 WL 5181567, at *6 (D.S.C. Oct. 21, 2021), *recommendation adopted sub nom. Flattery v. Kijakazi*, Civil Action No. 9:20-cv-02600-RBH, 2021 WL 5180236 (D.S.C. Nov. 8, 2021) ("although there is no bright line rule for articulating the consideration of the[] [supportability and consistency] factors, the [court] questions . . . whether dedicating a single sentence to each factor provides a 'narrative discussion' that adequately explains the ALJ's reasoning with regard to [the] opinion.") (quoting *Monroe v. Colvin,* 826 F.3d 176, 191 (4th Cir. 2016)); *see also* SSR 96-8p, 1996 WL 374184 at *7 (requiring a "narrative discussion" of how the evidence supports each work-related conclusion in the RFC).

Costa's treatment notes indicating that Plaintiff's medications had not significantly improved her PTSD and agoraphobia symptoms were consistent with the Sunrise treatment records showing the providers regularly altering and adjusting the doses of powerful psychotropic medications (A.R. at 428, 455, 470, 485, 539, 546-47, 591, 614).  The Sunrise records consistently noted that Plaintiff was "restless" and described her mood and affect as "anxious" fifty percent of the time (A.R. at 426-28, 433-35, 443-44, 453-55, 467-69, 483-84,

524-25, 531-32, 537-39, 544-46, 563-65, 589-91).  Costa noted that Plaintiff appeared nervous, tremulous, panicky and difficult to calm (A.R. at 614).  Although the Commissioner argues that the ALJ acknowledged that the Sunrise mental status examination results were "abnormal," the ALJ did not explain why those results were inconsistent with the Sunrise providers' assessment that Plaintiff would be limited in her ability to maintain regular attendance and appropriately respond to co-workers (Dkt. No. 28 at 15).  *See Pena v. Comm'r of Soc. Sec.,* Civil Action No. 19-10670, 2019 WL 7342529, at *7 (E.D. Mich. Nov. 20, 2019) (the ALJ failed to cite specific notes or records to explain how or why the plaintiff's mental status examinations, which the ALJ characterized as "largely normal," were inconsistent with the experts' opinions); *Swain v. Berryhill,* Case No. 18-cv-145-PB, 2018 WL 5342714, at *8 (D.N.H. Oct. 29, 2018) (the ALJ failed to explain "how moderate findings on mental-status examinations are inconsistent with an opinion that [plaintiff] would be absent from work more than three times a month [and precluded from working] due to his impairments or treatment for them.").

The ALJ also failed to address the consistency between the Sunrise treatment providers' opinions and other opinions in the record with respect to absenteeism and time off-task.  *See Elizabeth P. v. Comm'r of Soc. Sec.*, No. 3:20-CV-891 (CFH), 2022 WL 507367, at *13 (N.D.N.Y. Feb. 18, 2022) ("the ALJ's failure to explain sufficiently the supportability and consistency of each opinion relating to time off task and absenteeism with the treatment record and the other opinions requires remand."); *Flattery,* 2021 WL 5181567, at *7 ("Notably absent in the ALJ's articulation here is any discussion of the consistency with other medical opinions in the record. The regulations contemplate that an ALJ will consider other medical opinions in the record when analyzing the consistency factor.") (citing 20 C.F.R. § 416.920c(c)(2)).  Thomas opined that Plaintiff's deficits would preclude her from maintaining

regular attendance and seriously limit her ability to get along with co-workers or peers (A.R. at 514-15).  That opinion is consistent with Costa's opinion that Plaintiff's anxiety with agoraphobia prevented her from leaving her apartment, except to attend appointments, and from interacting with others (A.R. at 500, 517).  Costa's and the Sunrise providers' opinions were consistent with Williams' observations that Plaintiff presented with a flat and depressed affect and signs of anxiety (A.R. 576, 581), her reports, which Williams deemed reliable, that she could not leave the house by herself (A.R. 575-77, 580, 582), and his diagnoses, which were based on mental status examinations and Plaintiff's self-reports about her symptoms and activities, of neurodevelopmental disorder, PTSD, generalized anxiety disorder, and major or moderate depressive disorder (A.R. 577, 581).  The treatment records in this case are very consistent across providers and the treating providers' opinions about Plaintiff's functional limitations are also consistent.  "Absent sufficient articulation, the court cannot discern whether the ALJ's assessments of the persuasiveness of [Costa's and the Sunrise providers'] opinion[s] . . . are supported by substantial evidence and, in turn, whether the RFC assessment is supported by substantial evidence."  *Howen v. Saul,* Civil Action H-19-4358, 2021 WL 1169331, at *7 (S.D. Tex. Mar. 25, 2021); *see also Reuter v. Comm'r of Soc. Sec. Admin.,* No. CV-20-00456-TUC-JGZ (EJM), 2022 WL 428611, at *10, *11 (D. Ariz., Jan. 21, 2022), *recommendation adopted,* No. CV-20-00456-TUC-JGZ (EJM), 2022 WL 425564 (D. Ariz. Feb. 11, 2022) (remanding due to the ALJ's failure to address the supportability and consistency of medical opinions that were supported by and consistent with the plaintiff's symptoms of panic, fear, and anxiety).

In determining that Plaintiff had not been under a mental health disability during the relevant period, the ALJ "highlighted that the record showed no evidence of visits to the emergency room due to psychiatric symptoms or any psychiatric hospitalizations . . . ," *Pressley*

*v. Berryhill*, CIVIL ACTION NO. 16-40050-TSH, 2017 WL 5760915, at *17 (D. Mass. Sept. 18, 2017) (citing *Sanchez v. Colvin*, 134 F. Supp. 3d 605, 614 (D. Mass. 2015); *Wysocki v. Colvin*, Civil Action No. 13-30188-MGM, 2014 WL 6485887 at *3 (D. Mass. Nov. 19, 2014), and relied on the records of the mental status examinations (A.R. at 56).  These were appropriate factors for the ALJ's consideration.  *See id.; see also, e.g., Glacken v. Berryhill*, 382 F. Supp. 3d 116, 122 (D. Mass. 2019) (in rejecting a claim of disability, the ALJ was entitled to rely on the unremarkable results of the claimant's mental status examinations) (citing *Ortiz v. Colvin*, Civil Action No. 3:15-cv-30215-KAR, 2017 WL 1015006, at *9 (D. Mass. Mar. 15, 2017); *Tucker v. Astrue*, Civil Action No. 11-30115-KPN, 2011 WL 7639240, at *4 (D. Mass. Mar. 27, 2011)). This is not a record that compels a conclusion of disability.  In the court's view, remand is required because the ALJ's RFC appears to rest in significant part on a consultative report that cannot be deemed persuasive because it is inconsistent in many fundamental respects with the remainder of the record and because district courts (albeit in other jurisdictions) have required more in the way of an explanation as to the consistency and supportability factors than is present here.

        VI.    CONCLUSION

        For the reasons stated above, Plaintiff's motion for judgment on the pleadings (Dkt. No. 19) is allowed and the Commissioner's motion to affirm her decision (Dkt. No. 27) is denied. The case is remanded to the Commissioner for further proceedings consistent with this opinion. The clerk is directed to close the case.

        It is so ordered.

Date:  March  30 , 2022                          /s/ Katherine A. Robertson
                                                 KATHERINE A. ROBERTSON
                                                 U.S. MAGISTRATE JUDGE